# In the United States Court of Federal Claims

No. 21-1770
(Filed: April 15, 2022)
(Re-Filed: May 4, 2022)[1]

| | |
|---|---|
| * * * * * * * * * * * * * * * * * * * * * <br> STRATERA FULCRUM TECHNOLOGIES, LLC <br>                *Plaintiff*, <br> v. <br><br> THE UNITED STATES, <br>                *Defendant*, <br><br> and <br> HALVIK CORP., <br>                *Intervenor*, <br><br> and <br> STEAMPUNK, INC., <br>                *Intervenor*, <br><br> and <br> BOOZ ALLEN HAMILTON INC., <br>                *Intervenor*, <br><br> and <br> RIVA SOLUTIONS, INC., <br>                *Intervenor*. <br> * * * * * * * * * * * * * * * * * * * * * | Bid protest; post-award bid protest; best value determination; highest technically rated proposal with a fair and reasonable price; transitive property of inequality; unequal treatment; *Blue & Gold* |

    *Meghan F. Leemon*, Washington, DC, for plaintiff, Stratera Fulcrum Technologies, LLC, with whom were *Jonathan T. Williams* and *Eric A.*

---

[1] This opinion was originally issued under seal in order to afford the parties an opportunity to propose redactions of the protected material. We have redacted information necessary to safeguard the competitive process. Redactions are indicated by brackets.

1

*Valle*, of counsel.

*John M. McAdams III* and *Elinor J. Kim*, Trial Attorneys, United States Department of Justice, Civil Division, with whom were *Brian M. Boynton*, Principal Deputy Assistant Attorney General, *Patricia M. McCarthy*, Director, and *Lisa L. Donahue*, Assistant Director, for defendant. *Nicholas Oettinger* and *Andrew Squire*, United States Patent & Trademark Office, of counsel.

*Alexander J. Brittin*, Washington, DC, for intervenor, Halvik Corp., with whom were *Mary Pat Buckenmeyer* and *A. Jonathan Brittin, Jr.*, of counsel.

*David S. Black*, Tysons, VA, for intervenor, Steampunk, Inc., with whom were *Gregory R. Hallmark*, *Amy L. Fuentes*, *Kelsey M. Hayes*, and *Hillary J. Freund*, of counsel.

*Elizabeth N. Jochum*, Washington, DC, for intervenor, RIVA Solutions, Inc., with whom were *Tjasse L. Fritz*, *Samarth Barot*, and *Patrick Collins*, of counsel.

*Gary J. Campbell*, Washington, DC, for intervenor, Booz Allen Hamilton Inc., with whom was *Lidiya Kurin*, of counsel.

## OPINION

This is a post-award bid protest of the United States Patent and Trademark Office's ("USPTO" or "agency") decision to award an indefinite-delivery, indefinite-quantity contract for IT services to five companies: one non-intervening company, Science Applications International Corporation ("SAIC"), and four intervening companies, Halvik Corp. ("Halvik"); Booz Allen Hamilton Inc. ("BAH"); RIVA Solutions, Inc. ("RIVA"); and Steampunk, Inc. ("Steampunk"). Plaintiff, Stratera Fulcrum Technologies, LLC ("Stratera"), complains that the agency's best value determination did not adhere to the solicitation, that the best value determination was unlawful and arbitrary, and that the agency engaged in unequal and arbitrary evaluations of proposals. After a remand, the matter is now fully briefed on cross-motions for judgment on the administrative record ("MJARs"). Oral argument was held on March 14, 2022. Because the agency's actions were reasonable, we deny the protest for the reasons set out below.

BACKGROUND

On May 29, 2020, USPTO issued a Request for Proposals ("RFP" or "solicitation") for an indefinite-delivery, indefinite-quantity ("IDIQ") contract for information technology ("IT") services.[2] The RFP was issued to twenty-four businesses—fifteen small businesses and nine large businesses—which were pre-selected following the agency's market research through a Request for Information ("RFI"). The solicitation was then amended twice.[3] The agency anticipated awarding multiple contracts, with five as the intended minimum amount, but it reserved the right to award fewer or more than five contracts. The agency also sought to have a mix of small and large business contractors and intended to award the contracts at a ratio of 3:2 small-to-large businesses. The IDIQ would run for an ordering period of 10 years with a ceiling of $2 billion.

Awards would be made based on the best value continuum and to the businesses that presented the offers that were the "Highest Technically Rated with a Fair and Reasonable Price" ("HTRFRP"). AR 540. The offers would be rated based on the following factors, listed in descending order of importance: (1) Small Business Participation, (2) Technical Approach, (3) Past Performance, (4) Program Management and Staffing Approach, and (5) Price. "Non-price factors, when combined, are significantly more important than price." *Id.* Factor 1 would be rated as either Satisfactory or Unsatisfactory.[4] Factors 2 and 4 would be rated as either Superior, Satisfactory, or Unsatisfactory. Factor 3 would be rated as either Superior, Satisfactory, Neutral, or Unsatisfactory. Factor 5 would only be "evaluated to determine if the price is fair and reasonable in accordance with FAR 15.404-1." AR 541. Proposals were due July 30, 2020.

Following the submission of offers, the agency began its initial

---

2 Specifically, the IT services were for "Agile Teams, in support of development, modernization, enhancement, operations, and maintenance of USPTO products which are comprised of both legacy and modernized components." AR 469.

3 All references to the solicitation are to the second amended solicitation.

4 If an offeror was a small business, however, this factor was inapplicable.

evaluation. The agency's evaluation team assessed each proposal and provided ratings, findings (such as strengths and weaknesses), and narratives. AR 2246, 2253. The following ratings were assigned to the protestor and awardees:

| Vendor Name | Business Size | Factor 1 | Factor 2 | Factor 3 | Factor 4 | Factor 5 |
|---|---|---|---|---|---|---|
| Halvik Corporation | Small | N/A | Satisfactory | Superior | Superior | Fair and Reasonable |
| RIVA | Small | N/A | Superior | Superior | Satisfactory | Fair and Reasonable |
| Steampunk | Small | N/A | Satisfactory | Superior | Superior | Fair and Reasonable |
| Booz Allen Hamilton | Large | Satisfactory | Superior | Superior | Superior | Fair and Reasonable |
| SAIC | Large | Satisfactory | Satisfactory | Superior | Superior | Fair and Reasonable |
| Stratera Fulcrum | Small | Satisfactory | Satisfactory | Satisfactory | Satisfactory | Fair and Reasonable |

Def.'s Mot. at 6.

The agency then sought to determine which proposal represented the best value to the agency under HTRFRP. Rather than conduct a head-to-head comparison of each proposal, the evaluation team used a method known as the transitive property of inequality to compare proposals.[5] Following a brief evaluation of the offers and their rankings, the agency selected a small business control offeror, [*****], to which every other small business offeror would be compared.[6] Using this method, the agency determined that there were only three small business proposals superior to [*****]: Halvik, Steampunk, and RIVA. SAIC was then compared to [*****] and found to be superior, thus SAIC was superior to all other small business offerors. BAH was found to be superior to SAIC, and SAIC was found to be superior to all other large business offerors, thus BAH and SAIC were rated as the highest technically rated remaining offerors. The evaluation team recommended those five offerors as awardees. Following the Source Selection Authority's review of the proposals and the evaluation team's recommendations and findings, SAIC, BAH, Halvik, Steampunk, and RIVA were awarded contracts on April 2, 2021.

---

[5] The transitive property of inequality can essentially be boiled down to the following: if $a > b$, and $b > c$, then $a > c$. For the purposes of this procurement, it would be used to say that if Offer 1 is better than Offer 2, and Offer 2 is better than Offer 3, then Offer 1 is better than Offer 3, rendering a direct comparison between Offers 1 and 3 unnecessary.

[6] SAIC was also selected as a control offeror but only to compare large business proposals. No large businesses, however, are protesting this procurement.

On April 26, 2021, various offerors protested the agency's decision to the GAO on a variety of grounds. The GAO denied the protests. One specific ground of protest was that the agency's evaluation of Halvik's past performance was unreasonable; the protestors alleged that Halvik included references for work performed by a subsidiary, SSB, Inc. ("SSB"), and Halvik should not claim SSB's work as its own as the RFP did not explicitly allow it. GAO agreed that the agency's evaluation of Halvik was unreasonable, but found that no prejudice resulted from Halvik's inclusion, as no protestor would have been next in line for award over [*****].

Following GAO's decision, the protestor and two other small businesses which protested at GAO, M6-VETS, LLC, and RCH Partners, LLC, filed three related bid protests here. During the proceedings, the parties agreed to a remand so that the agency might re-examine whether it properly evaluated Halvik's past performance rating in light of the GAO ruling. The agency sustained its finding, and the parties presented their cross-motions for judgment on the administrative record.

## DISCUSSION

We review bid protests in accordance with the standards laid out in the Administrative Procedure Act. *Advanced Data Concepts, Inc. v. United States*, 216 F.3d 1054, 1057 (Fed. Cir. 2000) (citing 28 U.S.C. § 1491(b)(1) (1996)). Unless the agency's actions were "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," we will not interfere with them. 5 U.S.C. § 706(2)(A) (2018). In other words, as long as an agency's actions were reasonable and not in violation of any statute or regulation, then we will not interfere with them. An agency's error, however, is not enough by itself; that error must also be prejudicial to the protestor. *Office Design Grp. v. United States*, 951 F.3d 1366, 1373 (Fed. Cir. 2020) (citing *Glenn Def. Marine (ASIA), PTE Ltd. v. United States*, 720 F.3d 901, 907 (Fed. Cir. 2013)). "To establish prejudicial error, a protestor must show that but for that error, the protestor had a substantial chance of receiving a contract award." *Id.* at 1373–74 (citing *Alfa Laval Separation, Inc. v. United States* 175 F.3d 1365, 1367 (Fed. Cir. 1999)).

Stratera presents numerous bases for its protests. First, it argues that the agency did not follow the solicitation when evaluating proposals. Second, Stratera contends that the agency's best value determination methods were arbitrary and not in accordance with the law. Third, Stratera

5

argues that the evaluation of its and Halvik's past performance was arbitrary and capricious.  Fourth, Stratera contends that its technical approach evaluation was unreasonable and that it was evaluated unequally compared to other offerors.   Finally, Stratera argues that its program management and staffing approach evaluation was unreasonable and that it was evaluated unequally compared to other offerors. We take each argument in turn, except for the argument concerning Halvik's past performance, which will be presented last.

### I.     USPTO Followed the Solicitation

The protestor first argues that the agency contravened the solicitation in two ways.  First, it contends that the agency pre-determined the number of contracts to be awarded, despite the RFP saying the opposite, and did not document the reasoning for making only five awards.   Next, it argues that the agency structured the best value analysis to meet that predetermination by first finding the three highest-rated small businesses, then finding the next two highest-rated businesses.   The protestor contends that the dual structure of the analysis allowed the agency to meet its target award and ratio, as the three highest-rated small businesses being picked first ensures that the 3:2 ratio is met because large businesses would win the remaining awards due to natural competitive advantages.   Stratera argues this contravened the solicitation, as the solicitation said it was seeking highest technically rated offerors.

The government responds that the agency simply worked towards the goals stated in the solicitation.   It argues that the solicitation set five awards as the target.   It further argues that splitting the best value analysis into phases was also called for in the solicitation.   We agree with the government.

First, while the agency did say it had not predetermined the number of exact awards and reserved the right to award more or fewer contracts as it saw fit, it also said that it (1) intended to award a minimum of five contracts and (2) intended to award contracts at a 3:2 ratio of small-to-large businesses.   AR 540. It is eminently reasonable for the agency to structure its approach to follow what it proposed.

Next, the agency adhered to the solicitation when it divided its best value analysis between small businesses and then all businesses.   While this was a HTRFRP procurement, and the protestor did make a convincing argument that by divvying up the analysis, the agency was not actually selecting the highest-rated proposals, the RFP explicitly said that it would first select at least the three highest-rated small businesses as presumptive awardees.   AR 541.

Therefore, the agency followed the solicitation when it selected Steampunk, RIVA, and Halvik as awardees before selecting the next two awardees.

## II.     USPTO Reasonably Conducted Its Best Value Analysis

Stratera also presents two reasons as to why the agency's best value comparison of proposals was unreasonable.[7]  First, Stratera argues that the agency's use of the transitive property of inequality was arbitrary.  Using a mathematical principle normally reserved for comparing objective numbers to compare subjective proposals, Stratera argues, is unreasonable.[8]  It contends that using the transitive property meant the agency would never actually determine the highest-rated proposals.   It would only determine if one proposal is better than another, but it would not actually compare the features of proposals to all other proposals' similar features.   It also argues that the selection of [*****] as the control was arbitrary, as the agency only selected [*****] because it was the [*****].   Second, Stratera contends that USPTO did not consider price in its analysis, as is required by law.   It argues that the agency did not determine whether a proposal was worth any premium it would pay in price.

The government responds that using the transitive property was reasonable.   It argues that it reasonably selected [*****] as the control based on the proposal's merits to achieve the agency's goal of having to do fewer comparisons than it normally would do when comparing all offerors.   It also contends that the transitive property was reasonably performed, as the agency reasonably compared [*****] with all other small business offerors.   It was

---

7 Stratera does appear to make an argument that the HTRFRP method was not done correctly, as the proposals were not assigned a numerical score. Stratera does not provide any authority for the proposition that procurements done using HTRFRP must have a numerical score, as it only cites a procurement in which that happened as an example.

8 To illustrate its point, Stratera repeatedly uses a metaphor that using the transitive property to compare proposals, "which often involves comparing apples to oranges," is unreasonable.  Pl.'s Mot. at 11.  "The fact that one prefers apples over oranges and prefers oranges over bananas does not ipso facto mean that one prefers apples over bananas."  *Id.* at 11 n.7 (Emphasis in original).  We do not accept the metaphor.  One's preference between fruit is inherently subjective.  For evaluations of technical proposals to have any meaning, we have to assume that they are based on objective criteria, whether done through a one-on-one comparison or by the shortcut used here.

7

then reasonable to assume that because only three small business offerors were superior to [*****], those three were also superior to all other small business offerors.   Finally, it argues that Stratera waived its price argument as it did not submit a protest prior to the submission of bids.   We agree with the government and shall address Stratera's second argument first.

An offeror must protest patent errors in a solicitation before offers are due.   *Blue & Gold Fleet, L.P. v. United States*, 492 F.3d 1308, 1313 (Fed. Cir. 2007).   The failure to do so means the offeror waives that argument in a later protest.   *Id.*   The solicitation made it clear that the only consideration the agency would make of price was whether it was fair and reasonable.   Under the *Blue & Gold* standard, Stratera had to protest this aspect of the procurement before offers were due.   It did not do so and has thus waived the right to protest the issue now.

Next, Stratera protests the use of the transitive property of inequality in the proposals' comparisons.   The transitive property is not prohibited by statute or the FAR.   It also appears that while the GAO has encountered such schemes before, this is the first time such a comparative analysis is before this court.   Further, the FAR affords great flexibility to agencies in how they conduct procurements and evaluations.   FAR 1.102-4(e).   Therefore, if the property was applied reasonably, then we shall not interfere with the agencies' decision.

The use of the transitive property was reasonable.   The agency was looking for the highest-rated proposals, and it is reasonable to assume, for example, that if the agency reasonably believed that Steampunk's offer was better than [*****], and [*****] was better than Stratera's, then Steampunk's would be better than Stratera's.   Further, with 24 businesses submitting proposals, the agency reasonably believed that it could cut down on the number of comparisons that had to be made (from "over 170" to only 18), allowing it to conduct its best value analysis more efficiently.   AR 952.   The agency reasonably compared the control offeror to the other small business offerors, and we will not interfere with the results of such an analysis.

Next, [*****] was reasonably selected as the control offeror.   Stratera argues that the agency selected [*****] as the control "based merely on [*****]."   Pl.'s Mot. at 13.   As the agency explained, however, it sought to select a control offeror that would "allow the evaluation team to identify the three highest technically rated small businesses with the fewest possible number of vendor-to-vendor comparisons."   AR 2254.   This would require a small business with an apparently high-ranking, competitive proposal.   Based on the

8

proposals' adjectival ratings, the agency identified Halvik, Steampunk, and [*****] as possible controls, and it selected [*****] because it was [*****]. Because the agency was only selecting the control offeror, and not yet the actual awardees, an exhaustive comparative process was not needed. The agency reasonably selected its possible controls. Indeed, its possible controls were two awardees and the fourth-highest small business proposal, [*****]. Further, although the agency only selected [*****] out of the three because its name was [*****], the agency points out it simply made a choice, as there were no other criteria to select the control. It reasonably selected the control candidates, and we will not interfere with the decision as to how it would ultimately select the control offeror.

### III. USPTO's Past Performance Evaluation of Stratera Was Reasonable

Stratera next argues that the agency's evaluation of its past performance was unreasonable. It contends that the agency only relied on the number of Exceptional ratings from past performance Questionnaires ("PPQs") the offeror received, violating the RFP. It argues that this reliance means that the agency did not actually evaluate the offerors' past performance factors and that the agency's focus on Exceptional ratings devalued Very Good ratings.

The government argues that the agency's evaluation was reasonable. It contends that the agency did rely on all the information offerors submitted to it under past performance. It also argues that its reliance on Exceptional ratings was warranted by the solicitation, and it was reasonable to have them be a factor in its analysis. We agree with the government.

As the government and intervenors have correctly asserted, agencies are afforded great discretion when evaluating an offeror's past performance. The agency had extensive discretion in evaluating and relying on the information that was submitted to it for past performance, including the PPQs and their respective ratings. Further, the agency's analysis of offerors' past performances clearly took into account a variety of factors, and it was not simply based on the number of Exceptional ratings.[9]  *See* Tab 26. Because the agency's analysis was reasonable, we will not interfere with its decision.

---

9 Correlation does not equal causation. It is entirely foreseeable that offerors with Superior ratings in past performance would likely have a large number of Exceptional ratings in PPQs as well.

9

## IV. Unreasonable Evaluations

Stratera then contends that the agency unreasonably evaluated its proposal, assigning weaknesses that it did not deserve under both its technical approach and its program management and staffing approach. As with all other aspects of our decision, we examine the agency's evaluations for reasonability.

### a. The Agency Reasonably Evaluated Stratera's Technical Approach

Stratera argues that the agency unreasonably assigned it two weaknesses under its technical approach. It first argues that the agency improperly assigned it a weakness for lacking detail in its discussion of microservices architecture. Stratera contends that it provided all of the information required by the RFP and that the agency did not specify what details were missing. Second, it argues that it was assigned a weakness for not proposing the use of certain features (i.e., "flags/toggles"), which would prevent incomplete features from "becom[ing] enabled in production before they are completed," when the RFP did not call for such a feature. Pl.'s Mot. at 34. It argues that it did have measures in place to prevent incomplete features from being released early.

The government responds that in both cases, the agency reasonably made those findings, and they were grounded in the solicitation. For the first weakness, the government argues that the description of microservices architecture generally lacks details, which Stratera should have included because it included the concept in its proposal. For the second weakness, the government contends that Stratera did not actually propose a method to "prevent incomplete features from becoming enabled in production." Def.'s Mot. at 22. It argues, however, that Stratera did not present its proposal as a way to mitigate the implementation of incomplete features. The government also disagrees with Stratera that its proposal does mitigate the risk of implementation of incomplete features. We find no reversible error in the agency's assessment, and Stratera's disagreements with the agency's evaluation are not enough to warrant a foray into those evaluations.

We cannot say that the agency was unreasonable in its assessment of the microservices architecture. While Stratera points to explanations in its proposals about how it would use microservices architecture, such as how it would "deliver smaller, packaged deployments while incorporating security into each feature deployment" or how "[p]roduct teams utilize a set of microservices related to a unique business domain and explicit boundaries are maintained to

reduce dependencies," the agency clearly felt that such explanations were inadequate. Pl.'s Mot. at 33 (quoting AR 2025) (alterations in original). It was not unreasonable for the agency to conclude that such generalities lacked the detail required to fully evaluate Stratera's proposal. It is a matter of technical discretion. While Stratera argues that these details were not required, it chose to include microservices architecture in its offer, and the burden was on it to explain in detail how that feature would be used.

With respect to the lack of flags/toggles in its proposal, we cannot say that the agency was acting unreasonably. The risk of implementation of incomplete features was apparent to both the agency and Stratera. The agency's evaluators assessed that Stratera's proposal did not mitigate that risk sufficiently. Evaluation of such technical matters is within the discretion of the agency absent clear abuse.

### b. The Agency Reasonably Evaluated Stratera's Program Management and Staffing Approach

Stratera argues that it was unreasonably assigned a weakness under its program management and staffing approach. It argues that the agency assigned it a weakness for its "14-day transition out timeframe and purported lack of communication with the government and other vendors." Pl.'s Mot. at 38 (citing AR Tab 27 at 23F4). Stratera contends that this is not in accord with the solicitation and does not accurately reflect Stratera's proposal. It argues that the timeframe is sufficient and was what the solicitation required. It also contends that its communication was sufficient, as it would adequately document what any incoming operators would need to know.

The government responds that it reasonably assigned Stratera a weakness. It argues that the short transition timeframe plus the lack of adequate communication poses a risk to contract performance. In particular, relying only on documentation as communication, rather than direct communication, posed a risk that vendors would not sufficiently perform, and Stratera does not adequately explain why documentation alone is sufficient.

Once again, Stratera's arguments are mere disagreements. Although Stratera provided a timeframe and method for communication, the agency is not required to find that what Stratera provided was sufficient. It reasonably believed that Stratera's proposal was lacking and posed a risk to contract performance. Such a decision is up to the agency's discretion.

11

## V.    The Agency Did Not Engage in Unequal Evaluations

Stratera argues that the agency engaged in unequal evaluations and that other offerors received strengths that Stratera should have received as well. Stratera identifies eight strengths under technical approach and two strengths under program management and staffing approach which other offerors received that it claims it should have received as well. The agency responds with differences between the proposals for each of those strengths. We agree with the agency.

Along with the broad discretion agencies are afforded in evaluating proposals and assigning strengths, succeeding on an unequal evaluation claim is a high bar for a protestor to clear, and Stratera simply does not clear that bar. To succeed on an unequal evaluation claim, the protestor must show that its proposal was "'substantively indistinguishable' or nearly identical" to other proposals. *Office Design Grp. v. United States*, 951 F.3d 1366, 1372. (Fed. Cir. 2020). We need not address every disagreement Stratera has with the agency's evaluations, as they are just that: disagreements.

For example, Stratera argues that, under Technical Approach, one offeror, Metric 8, received a strength for its proposed use of "Quality Indicators ('QI') and Key Performance Indicators" ("KPIs") to support product quality. Pl.'s Mot. at 26 (quoting AR Tab 25 at 14F2). Stratera maintains that it also proposed the same use of KPIs and actually went into greater detail than Metric 8.

The government responds that Metric 8's proposal did differ from Stratera's. First, it argues Stratera did not indicate it would use QIs. Next, the government contends that Metric 8 provided far greater detail on how it would use KPIs. We agree with the government.

Metric 8's proposal is distinguishable from Stratera's. First, as mentioned by the government, our review of the record finds no mention of QIs in Stratera's proposal. Further, the government is correct that Metric 8's proposed use of KPIs went into greater detail. Stratera's proposal mentions KPIs without going into any detail, *see* AR 2017, while Metric 8's proposal explained how KPIs and QIs would be used and provided samples of KPIs and QIs it would use. *See* AR 3270. Thus, the proposals are not indistinguishable, and we will not second guess the agency's technical evaluations.

**VI.    The Agency's Evaluation of Halvik's Past Performance Did Not Prejudice Stratera**

Finally, the protestor argues that the agency's analysis of Halvik's past performance was unreasonable.  It argues that Halvik submitted contract summaries from contracts performed by SSB, not Halvik.   It contends that SSB was not a previous incarnation of Halvik and that Halvik did not mention SSB or that it would use SSB's resources in its proposal.   It further argued that the remand did not correct any of these errors and was instead an attempt by the agency to defend its decision.  The government responds that it considered SSB a predecessor or an affiliate of Halvik and rightfully attributed SSB's past performance to Halvik, as SSB was fully absorbed into Halvik, merging their assets.

While the parties disagree about whether the evaluation was reasonable or not, we need not reach the issue, as Stratera has not demonstrated prejudice. Even if Halvik's evaluation was unreasonable, there is still another small business competitor, [*****], that would be ahead of Stratera for award. Because the other aspects of the agency's analysis were reasonable, Stratera has not demonstrated why it should be placed ahead of [*****].   Further, Stratera has not shown that, even if [*****] is ahead of Stratera, that the agency would have exceeded the minimum number of awards it intended and actually did give. Because Stratera would not be prejudiced if there were an error, its motion for judgment on the administrative record is denied.

## CONCLUSION

Because the agency acted reasonably during this procurement and in its analysis, Stratera's MJAR is denied and the government's and intervenors' cross-MJARs are granted.   The Clerk of the Court is directed to enter judgment for defendant and dismiss the case.   No costs.

s/Eric G. Bruggink
Eric G. Bruggink
Senior Judge
